**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                                          No. 96-4354

STEPHAN M. BULLIS,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, District Judge.
(CR-95-142-F)

Argued: March 6, 1998

Decided: April 14, 1998

Before MURNAGHAN and WILLIAMS, Circuit Judges, and
BROADWATER, United States District Judge for the
Northern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Joseph Blount Cheshire, V, CHESHIRE & PARKER,
Raleigh, North Carolina, for Appellant. John Howarth Bennett, Assis-
tant United States Attorney, Raleigh, North Carolina, for Appellee.
**ON BRIEF:** Janice McKenzie Cole, United States Attorney, Raleigh,
North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Stephan Bullis was convicted by a jury of mailing two pipe-bombs, see 18 U.S.C.A. § 1716 (West 1984 & Supp. 1997); arson, see 18 U.S.C.A. § 844(i) (West Supp. 1997); attempted arson, see 18 U.S.C.A. § 844(i); and using a destructive device during and in relation to a crime of violence, see 18 U.S.C.A.§ 924(c) (West Supp. 1997). Bullis was sentenced to life in prison plus 595 months. On appeal, Bullis raises four challenges to his convictions.**1** He contends that the district court improperly directed a verdict for the Government when it instructed the jury as to the effect of certain stipulations, that the prosecutor made several improper statements during closing arguments, that the district court abused its discretion in admitting photographs depicting the victim's injuries, and that the evidence was insufficient to sustain his conviction for mailing the second pipe-bomb. Finding no reversible error, we affirm Bullis's convictions.

I.

On July 10, 1995, Tracy Bullis received a package via the U.S. mail at her place of work, Business Telecom, Inc. (BTI). The package was eighteen inches long, four inches wide, and four inches deep; wrapped in brown paper; addressed to "BTI, c/o Tracey Bollis [sic], Provisioning Manager, 4300 Six Forks Road, Raleigh, NC 27609"; posted with ten Florida commemorative stamps; and addressed from "R.P.G. Products, P.O. Box 413, Raleigh, NC 27613." (J.A. at 104-05.) After Ms. Bullis opened the package and looked inside, it exploded. In addition to suffering numerous cuts, bruises, and burns, Ms. Bullis lost most of her left hand in the blast. Judith Harrison, a coworker, suffered a temporary loss of hearing as a result of the explosion. After the explosion, the crime scene was thoroughly

_____

**1** Bullis does not challenge his sentence on appeal.

searched, and the evidence was sent to the U.S. Postal Inspection Service Forensic Laboratory in Dulles, Virginia (USPIS Lab). On July 15, 1995, Stephan Bullis was arrested for mailing the bomb that injured his wife.

On July 25, 1995, Phyllis Davis, an employee of the United States Postal Service (USPS) at the Crabtree Valley Mall station opened a parcel bin that the USPS thought was out of service. When the bin was opened, a number of packages spilled out. One package was eighteen inches long, four inches wide, and four inches deep; wrapped in brown paper; addressed to "BTI, c/o H. Kasper, Director of Operations, 4300 Six Forks Road, Raleigh, NC 27609"; posted with ten Florida commemorative stamps; and addressed from"R.P.G. Products, P.O. Box 413, Raleigh, NC 27613." (J.A. at 118.) Because of the similarity to the earlier bomb, Postal Inspectors were alerted. As suspected, the package was determined to contain a pipe bomb. After defusing the bomb, Postal Inspectors sent the package to the USPIS Lab for testing.

In addition to the external similarities between the two bombs, the subsequent investigation by the USPIS Lab revealed the following:

  - Both bombs were booby-trap pipe bombs.

  - Both bombs were concealed within a cardboard box.

  - Both bombs were powered by 5 Panasonic "D" cell batteries, taped in a series with three quarter inch wide black electrical tape.

  - Both bombs used a switch built from the same type of wooden clothespin wrapped in copper wire. The switch wire in the first bomb appeared to be a fishing leader. The switch wire in the second bomb was a green plastic twist tie.

  - Both bombs were made from a six inch long by one and one-half inch diameter steel pipe with end caps. Although all four end caps were of the same width, one end cap was of a different depth.

  - Both bombs were secured to the cardboard with hot-melt glue, 2 inch wide beige plastic tape, bright metal wires, and twist ties.

3

- The fuel mixture from both bombs contained flattened ball smoke-less gunpowder, and 12 gauge Winchester overpowder cup wads. The flattened ball smokeless gunpowder in the second bomb is exclusively found in loaded ammunition manufactured by Winchester. The bomb maker, therefore, must have cut open a Winchester shotgun shell to obtain the powder.

Based on the aforementioned evidence, Dr. Raymond S. Voorhees, manager of the Physical Evidence Section of the USPIS Lab, determined that the same person or persons built both bombs.

During the course of the investigation, the following evidence was found in the Bullis's residence and garage:

- A curved piece of red plastic that was identified as being cut from the center of a 12 gauge Winchester Dove and Quail shotgun shell. This type of shell would have contained the overpowder cup wads found in the fuel mixture of each bomb.

- Fishing leader wires that were consistent with the switch wire from the first bomb.

- A green plastic twist tie found with a Japanese Beetle trap that matched the switch wire from the second bomb.

- Clothespins that were consistent with the clothespins used for the switch of both bombs.

- A small metal ball that was identified as a size 7 and one-half lead shot pellet, the type that would have been loaded into a 12 gauge Winchester Dove and Quail shotgun shell.

- Hot glue that was consistent with the hot glue used in both bombs.

- Wire found inside a vacuum cleaner was consistent with the wire in both bombs.

- Epoxy droppings that were consistent with the epoxy that held a model rocket engine in place in the second bomb.

Based on the aforementioned evidence, Dr. Voorhees concluded that, in his opinion, both bombs were assembled at the defendant's residence.

In addition to the evidence described above, the investigation revealed the following:

- A piece of cardboard in the second (unexploded) bomb contained the left thumbprint and left middle fingerprint of Bullis.

- On Friday, July 7, 1995, USPS employee Stephanie Hamer collected a package at Bullis's place of work that matched the description of the package containing the first bomb.

- On Friday, July 7, 1995, a postal customer saw a package that resembled the one containing the second bomb in the same parcel bin where the second bomb was eventually found.

- Bullis had made derogatory comments about Kasper, the intended victim of the second bomb.

- On February 18, 1995, Bullis placed an order for a book entitled The Poor Man's James Bond through the Barnes and Noble bookstore at the Crabtree Valley Mall. This book contains numerous instructions on how to make bombs.

- Ms. Bullis found a catalog from the author and publisher of The Poor Man's James Bond in her house.

- On June 5, 1995, Bullis purchased The Anarchist Cookbook and Fighting in the Streets.[2] Both books contain numerous instructions on the construction of bombs. Fighting in the Streets also refers to rocket propelled grenades as "RPGs," the same acronym listed on the return address of the two bombs.

- On June 21, 1995, Bullis purchased two pipes, six inches long by

---

[2] On July 14, 1995, Jeff Peake, the Barnes and Noble clerk who handled the transaction, picked Bullis's picture out of a photo spread.

one and one-half inches in diameter, and four end caps. Although all four end caps were of the same width, one end cap was of a different depth.[3]

- Ms. Bullis confirmed that her husband had recently purchased Panasonic "D" cell batteries.

- During the nights preceding July 7, 1995, Bullis would get up from bed and go work in the garage.

- On the morning of July 7, 1995, the Bullis's trash was already placed out for collection. This was the first occasion that Ms. Bullis could remember in which her husband placed the trash out for collection without prompting from her.

On August 15, 1995, Bullis was named in a six count indictment with mailing a pipe-bomb (Counts One and Four), see 18 U.S.C.A. § 1716 (West 1984 & Supp. 1997); arson (Count Two), see 18 U.S.C.A. § 844(i) (West Supp. 1997); attempted arson (Count Five), see 18 U.S.C.A. § 844(i); and use of a destructive device during and in relation to a crime of violence (Count Three and Six), see 18 U.S.C.A. § 924(c) (West Supp. 1997). The first bomb provides the basis for Counts One, Two, and Three. The second (unexploded) bomb forms the basis for Counts Four, Five, and Six.

On February 5, 1996, Bullis was arraigned. A jury trial began the following day. On February 14, 1996, Bullis was found guilty on all counts. He was subsequently sentenced to life in prison plus 595 months. Bullis filed a timely notice of appeal on April 23, 1996. On appeal, Bullis argues that the district court improperly directed a verdict for the Government when it instructed the jury as to the effect of certain stipulations he entered with the Government. Bullis also contends that the prosecutor made several improper statements during closing arguments. In addition, Bullis challenges the admission of three photographs depicting his wife's injuries. Finally, Bullis argues

---

[3] Gennie Davis, the Home Depot clerk who handled the transaction, picked Bullis's picture out of a photo spread. Ms. Davis remembered the transaction, in part, because one of the end caps was smaller than the other three.

that the evidence was insufficient to sustain his conviction for mailing the second pipe-bomb. We address each argument in turn.

II.

Bullis first argues that the district court erroneously instructed the jury on the effect of several stipulations that he had entered with the Government. During the course of the trial the parties stipulated (1) that both bombs were destructive devices, (2) that the BTI building was used in an activity affecting interstate or foreign commerce, and (3) that both bombs were nonmailable items. In light of these stipulations, the district court gave the following instruction:

> Before the trial of this case, counsel for the Government and for the Defendant entered into certain stipulations or agreements, in which they agreed that certain facts could be taken as true without further proof. By this procedure, it is often possible to save much time. The stipulated facts were read to you earlier, and since the parties have so agreed, you are to take these facts as true for the purposes of this case.

(J.A. at 33.) On appeal, Bullis argues that the district court's instruction on the significance and effect of the stipulations essentially directed a partial verdict for the Government and, therefore, deprived him of his right to have a jury determine his guilt.

Bullis, however, did not contemporaneously object to the instruction given to the jury. The Federal Rules of Criminal Procedure provide: "No party may assign as error any portion of the [jury] charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Fed. R. Crim. P. 30. Nevertheless, under Rule 52(b) of the Federal Rules of Criminal Procedure, we may notice, in our discretion, "[p]lain errors or defects affecting substantial rights," even though no objection was made. See, e.g., Johnson v. United States, 117 S. Ct. 1544, 1548 (1997); United States v. Olano, 507 U.S. 725, 731-32 (1993). Rule 52(b) contains four elements that must be satisfied before an appellate court may notice an error not preserved by a timely objection: (1) the instruction must, in fact, be error, (2) the error must be plain, and (3) the error

7

must affect the substantial rights of the defendant. See Johnson, 117 S. Ct. at 1549. "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotation marks and citation omitted); see also Olano, 507 U.S. at 736-37 (noting that a forfeited error should be noticed only if it "`seriously affect[s] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence" (alteration in original) (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936))).

Rule 52(b) first requires that an error occur in the proceeding below. In United States v. Muse, 83 F.3d 672 (4th Cir.), cert. denied, 117 S. Ct. 261 (1996), this Court held that a defendant who "pleads not guilty to a crime and elects to proceed before a jury" is entitled to an instruction directing the jury to "consider[ ] whether the government has proved beyond a reasonable doubt all the elements involved in the crime charged -- even if the defendant and the government have entered a stipulation as to certain of those elements." Id. at 679 (emphasis added). While instructing the jury as to Counts One and Four, the district court stated:

> I instruct you that the parties have stipulated that both of the items received in evidence in this case, as Government's Exhibits 1 and 2 are bombs, and that, as such, they are explosive and destructive devices, and therefore, are "non-mailable" for purposes of these instructions. You are to accept as an established fact that the packages which are the subject of this case each contained a nonmailable item -- that is, a bomb or explosive or destructive device. I instruct you that the first element of each of Counts One and Four already has been established.

> . . .

> On the other hand, as to either or both of Counts One and Four, if you do not so find, or if you have reasonable doubt about any of these elements, then it would be your duty to find the defendant not guilty of such count.

8

(J.A. at 49, 52.) Similarly, the district court instructed the jury as to Counts Two and Five as follows:

> "Interstate commerce" means commerce or business between any place in one state and another place outside that state. It also means commerce between places within the same state, but passing through any place outside of that state. I instruct you that the parties have stipulated that the [BTI] building . . . was used in . . . an activity affecting interstate or foreign commerce. Therefore, you are to accept as an established fact that the building housing BTI in Raleigh is property used in . . . an activity affecting interstate or foreign commerce for purposes of these instructions. I instruct you that the second element of each of Counts Two and Five already has been established.
>
> . . .
>
> On the other hand, as to each of Counts Two and Five, if you do not so find, or if you have reasonable doubt about any of these essential elements, then it would be your duty to find the defendant not guilty of such count.

(J.A. at 57, 60.)

It is well settled that jury instructions must be viewed in their entirety and in context. See Cupp v. Naughton , 414 U.S. 141, 146-47 (1973). Moreover, the jury is presumed capable of following the instructions it receives. See United States v. Jones, 907 F.2d 456, 460 (4th Cir. 1990). In context, it is clear that the instructions did not direct a partial verdict against Bullis. Rather, the district court properly instructed the jury that if it had reasonable doubt regarding any element, including the elements to which the parties stipulated, that it must find Bullis not guilty. Cf. Muse, 83 F.3d at 678 (approving similar instruction). Accordingly, we conclude that the district court did not deprive Bullis of his "right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime[s] with which he [wa]s charged." United States v. Gaudin, 115 S. Ct. 2310, 2320 (1995).

9

III.

During closing arguments, the prosecutor made several arguments that Bullis now contends were improper. In particular, Bullis argues that the prosecutor (1) misstated the evidence, (2) vouched for the credibility of Government witnesses, and (3) demeaned the character and credibility of the defendant. Because defense counsel did not contemporaneously object to any of the prosecutor's comments, a new trial may be granted only upon a finding of plain error.**4** See Johnson v. United States, 117 S. Ct. 1544, 1548 (1997); United States v. Olano, 507 U.S. 730, 732 (1993); United States v. Mitchell, 1 F.3d 235, 239-40 (4th Cir. 1993).

A.

First, the prosecutor is accused of misstating the evidence. If true, that would be error. See, e.g, United States v. Dudley, 941 F.2d 260, 264 (4th Cir. 1991). For the reasons that follow, however, we do not believe that any of the prosecutor's statements affected Bullis's substantial rights.

1.

Prior to trial, both Jeff Peake and Gennie Davis selected Bullis's photograph from a photographic lineup. Gennie Davis's identification tied Bullis to the purchase of materials similar to those used in the two bombs. Jeff Peake's identification linked Bullis to the purchase of two books on bomb making. During closing arguments, the prosecutor reminded the jury that both Peake and Davis came into court and identified Bullis as the person with whom they had dealt. Bullis contends that the prosecutor's use of the word "identification" misstated the evidence. Specifically, Bullis contends that the prosecutor

_____

**4** During closing arguments the district court judge left the bench to work on "other matters." (J.A. at 1079.) Although Bullis implies that no objections were made as a result of the Judge's absence from the bench, he does not challenge the district court judge's action on appeal. Cf. Heflin v. United States, 125 F.2d 700, 701 (5th Cir. 1942) (mere absence of judge for a short time, without a showing of prejudice, is not reversible on direct appeal or collateral attack).

used that word to improperly suggest to the jury that Peake and Davis had made "in-court identifications," rather than "pre-trial photo identifications." We disagree. First, the prosecutor stated that both identifications were made during a pre-trial photo spread. Second, although made during a pre-trial photo spread, Peake and Davis nevertheless "identified" Bullis. See Fed. R. Evid. 801(d)(1)(C) (providing that pre-trial identifications are not hearsay). As a result, the prosecutor's use of the word "identification" did not misstate the evidence.

2.

Bullis also contends that the prosecutor misstated the evidence when he told the jury that Regina Hall "saw" the second bomb in the parcel drop box at the Crabtree Valley Mall Post Office on July 7, 1995. Again, we disagree. Regina Hall, a postal customer, testified that she saw several packages in the parcel bin in question on July 7, 1995, one of which resembled the package that contained the second bomb. Although Ms. Hall testified that, unlike the bomb, the package she saw had different stamps, she was positive that, like the bomb, the package had two rows of stamps. When the second bomb was discovered by Ms. Davis on July 25, 1995, there were only two packages with stamps in the bin: the package with the bomb and an envelope with only two stamps. In light of all the evidence, the prosecutor did not err in arguing that the package Ms. Hall saw on July 7, 1995, was the second bomb.

3.

Bullis also contends that the prosecutor misstated the evidence when he told the jury that both Dr. Voorhees and the defense's forensic expert, Denny Kline, concluded that the same person built both bombs. Despite Bullis's contentions to the contrary, Dr. Voorhees did state that the two bombs "were constructed contemporaneously and by the same individual or group of individuals." (J.A. at 626.) Although Mr. Kline did not specifically state that the same person made both bombs, we do not believe that the misstatement affected Bullis's substantial rights. The evidence that the two bombs were made by the same individual is so overwhelming that any error was harmless beyond a reasonable doubt.

B.

Next, Bullis argues that the prosecutor vouched for the credibility of Government witnesses. If true, that would be error. See United States v. Silva, 745 F.2d 840, 850 (4th Cir. 1984). Witness vouching occurs when a prosecutor gives his personal assurance that a witness is trustworthy. See United States v. Lewis, 10 F.3d 1086, 1089 (4th Cir. 1993). Bullis, however, fails to cite even one example of the prosection vouching for the credibility of a witness. After reviewing the record, we cannot find any instances of witness vouching that would constitute plain error. As a result, this claim is without merit.

C.

Bullis also contends that the prosecutor demeaned his character and credibility during closing arguments. Although the prosecutor variously described Bullis as unfeeling, self-absorbed, and an adulterer, the prosecutor did not say anything so egregious as to deprive Bullis of a fair trial. See United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995) (noting that a prosecutor's closing arguments must be viewed in the context of the entire trial). As a result, we find that this claim is also without merit.

IV.

Next, Bullis contends that the district court abused its discretion in allowing the Government to introduce three photographs depicting Ms. Bullis's injuries. Prior to trial, Bullis filed a motion in limine to exclude the photographs. In his motion, Bullis argued that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice. See Fed. R. Evid. 403. After a hearing, the district court denied the motion, concluding "that words could [not] possibly describe [Ms. Bullis's] injuries." (J.A. at 84.) A district court's evidentiary rulings are reviewed under the narrow abuse of discretion standard. See United States v. Gravely, 840 F.2d 1156, 1162 (4th Cir. 1988).

As a threshold matter, there is Bullis's suggestion that the photographs were not relevant to the crimes with which he was charged.

12

See Fed. R. Evid. 402 ("Evidence which is not relevant is not admissible."). Rule 401 defines relevant evidence as having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Here, Counts One and Four, mailing a pipe bomb, required the Government to prove that Bullis mailed the bomb with the intent to kill or injure another. See 18 U.S.C.A. § 1716. The photographs clearly demonstrate the violent nature of the crimes alleged. Thus, the photographs were relevant under Rule 401.

Although relevant, evidence may nevertheless be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403; see also Old Chief v. United States, 117 S. Ct. 644, 650 (1997) (noting that the "term `unfair prejudice' . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged"). The three photographs of Ms. Bullis's injuries were introduced to establish the defendant's intent to cause death or injury. As such, they were highly probative. Under similar circumstances, we have found the admission of gruesome and shocking photographs not to be unfairly prejudicial. See, e.g., United States v. Analla, 975 F.2d 119, 125-26 (4th Cir. 1992) (photographs of murder victim); United States v. Whitfield , 715 F.2d 145, 147-48 (4th Cir. 1983) (same). Perhaps Bullis's defense was damaged when the jury saw the photographs. That alone, however, is not a basis for excluding probative evidence. Indeed, "[e]vidence that is highly probative invariably will be prejudicial to the defense." United States v. Grimmond, 96-4825, 1998 WL 95273, at *8 (4th Cir. Mar. 6, 1998). We have no difficulty in concluding that it was not unfairly prejudicial for the jury to see photographs of the victim's injuries. There is simply no evidence that the photographs lured the jury "into declaring guilt on a ground different from proof specific to the offense[s] charged." Old Chief, 117 S. Ct. at 650. As a result, we hold that the district court acted well within its discretion in admitting the challenged photographs.

V.

Finally, Bullis challenges the sufficiency of the evidence to support his conviction for mailing the second bomb (Count Four). When

13

assessing the sufficiency of the evidence of a criminal conviction on direct review, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942).

Mailing nonmailable matter with the intent to kill or injure another has three elements. First, the Government must prove that the package in question contained a nonmailable item. Second, the defendant must knowingly deposit that package for mailing. Third, the defendant must intend to kill or injure another. See 18 U.S.C.A. § 1716. At issue here is whether there was sufficient evidence to prove the second element of the offense. Specifically, Bullis contends that there was insufficient evidence from which the jury could have concluded that the second bomb was in the mail stream prior to his arrest on July 15, 1995. For the reasons that follow, we conclude that there was.

The gravamen of Bullis's argument is based entirely on the flawed premise that the second bomb was mailed on (or close to) the date it was discovered at the post office. First, postal worker Phyllis Davis testified that the parcel drop box had not been emptied for some time due to the belief, albeit mistaken, that it was out of service. Second, postal inspector Charles Thompson testified that a number of the packages recovered from the same bin as the second bomb carried meter strips dated July 6, 1995. Third, postal customer Regina Hall testified that on July 7, 1995, she saw a package "similar in shape and appearance" to the second bomb in the bin in question. Fourth, there was overwhelming forensic evidence linking the defendant to the second bomb, including his fingerprints on parts inside the bomb. Cf. United States v. Burgos, 94 F.3d 849, 863-64 (4th Cir. 1996) (en banc) (noting that fingerprints on wrapping inside a package containing drugs was sufficient to link the defendant to the criminal activity), cert. denied, 117 S. Ct. 1087 (1997). Finally, the similarity between the two bombs strongly supports the Government's theory that they were made (and mailed) by the same person. Thus, the overwhelming evidence that Bullis sent the first bomb supports the jury's conclusion that he was also responsible for mailing the second bomb. In sum, we conclude that the evidence, viewed in the light most favorable to the Government, was sufficient to support the jury's finding that Bullis mailed the second bomb prior to his arrest on July 15, 1995. Accordingly, we find Bullis's argument to be without merit.

14

VI.

For the foregoing reasons, Bullis's convictions are affirmed.

AFFIRMED

15